UNITED STATES of America, Appellee,

v.

Claude Paul TARDIFF, Defendant,
Appellant.

No. 91–2040.

United States Court of Appeals,
First Circuit.

Heard June 2, 1992.

Decided July 8, 1992.

William A. Brown, Boston, Mass., by Appointment of the Court, for appellant.

Richard E. Welch, III, Asst. U.S. Atty., with whom A. John Pappalardo, Acting U.S. Atty., Boston, Mass., was on brief, for appellee.

Before SELYA, Circuit Judge, RONEY,* Senior Circuit Judge, and PIERAS,** District Judge.

---

* Of the Eleventh Circuit, sitting by designation.

** Of the District of Puerto Rico, sitting by designation.

SELYA, Circuit Judge.

Defendant-appellant Claude Paul Tardiff pled guilty to a 20–count information charging him with numerous acts of mail fraud in violation of 18 U.S.C. § 1341 (1988). At sentencing, the district court fixed the applicable guideline sentencing range (GSR) and imposed an incarcerative sentence at the low end of the range.[1] Defendant appeals. We affirm.

## I.

### Overview

An overview of the facts suffices to put this appeal into workable perspective. The defendant was the proprietor of "CPT Business Services." In that capacity, he successfully encouraged more than 70 persons to entrust funds to him for pooled investment. He also acted as a tax accountant and tax-return preparer for many of these individuals.

Tardiff mailed periodic statements to his clients, apprising them of the status of their accounts. In late 1986, when his investment decisions started to turn sour, Tardiff began falsifying these statements in order to paint a brighter picture. He lent credence to the confabulations by using newcomers' capital as well as his own funds to finance redemptions and other interim payments to investors. The web of lies became more and more elaborate as the losses mounted. Tardiff began taking greater and greater risks with clients' funds, striving valiantly to recapture lost ground. His efforts proved counterproductive: by the end of 1990, the pooled investment account, like Mother Hubbard's cupboard, *see* M. Goose, Old Mother Hubbard, *reprinted* in Oxford Dictionary of Nursery

Rhymes 317 (1966 ed.), was bare. Tardiff retained counsel, disclosed his peccadillos to the United States Attorney, and notified his erstwhile clients that their funds had vanished.

## II.

### Discussion

On appeal, defendant challenges three separate rulings made in the course of compiling the GSR. He also attempts to challenge the lower court's failure to depart downward. We deal with these points in sequence.[2]

### A.

### Amount of Loss

In respect to fraud crimes, the applicable offense level increases in proportion to the monetary magnitude of the fraud. Here, the district court found that the amount of loss to investors exceeded $800,000 and increased the offense level accordingly. *See* U.S.S.G. § 2F1.1(b)(1)(L) (in respect to fraud crimes, add 11 levels if the loss is more than $800,000 but not more than $1,500,000). Tardiff demurs. His counsel presses his objection from several directions, in a manner reminiscent of an all-out attack on a wagon train. We have managed to pluck four arrows from amidst the war whoops. Without exception, these arrows fly wide of the mark.

1. *Right of Rebuttal.* Tardiff insists that he was not given a sufficient opportunity either to rebut the assertions contained in the presentence investigation report (PSI Report) or to counter the impressions that the district court gleaned from certain victim impact statements

---

1. The genesis of the GSR was as follows. The base offense level for the offense of conviction was 6. U.S.S.G. § 2F1.1(a). The court added 11 levels because the scheme produced a loss to Tardiff's victims in excess of $800,000, U.S.S.G. § 2F1.1(b)(1)(L); added two levels because the offense of conviction involved more than minimal planning, U.S.S.G. § 2F1.1(b)(2); added two more levels for abuse of trust, U.S.S.G. § 3B1.3; and, finally, deducted two levels because Tardiff accepted responsibility for his actions, U.S.S.G. § 3E1.1. Because the net offense level was 19 and Tardiff was in criminal history

category I, the GSR was 30–37 months. *See* U.S.S.G. Ch. 5, Pt. A (sentencing table).

2. All references herein are to the sentencing guidelines in effect on the date Tardiff was sentenced, September 20, 1991. *See United States v. Harotunian,* 920 F.2d 1040, 1041–42 (1st Cir.1990) ("Barring any *ex post facto* problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing.") (citing 18 U.S.C. § 3553(a)(4)).

presented in conjunction therewith. The record belies his claim.

The PSI Report was completed on July 9, 1991. It incorporated the relevant portions of the victim impact statements. The materials were promptly tendered for review. Tardiff sent a ten-page reply to the probation officer in July. On August 2, his counsel made extensive written objections to the PSI Report. The defense also moved to postpone sentencing because Tardiff "need[ed] more time to prepare his response." The motion was granted and sentencing was delayed until September 20, 1991. The defense used the time to advantage, filing a supplementary rejoinder to the PSI Report on August 20, 1991. The probation officer answered the defendant's objections point by point. The last addendum to the PSI Report was delivered to the defense on September 5—more than two full weeks before the sentencing hearing.

The sentencing hearing was convened on September 20. The prosecutor pulled no rabbits out of his hat. He merely presented the same information that the defense had previously received and reviewed. The defendant did not move for a further continuance. He did not request an evidentiary hearing. He did not subpoena any witnesses or offer any evidence. In short, the defendant did not seek in any way to secure a further right of rebuttal.

■ It is clear that a defendant is not automatically entitled to a full-blown evidentiary hearing at the time of sentencing. *See, e.g., United States v. Shattuck*, 961 F.2d 1012, 1014–15 (1st Cir.1992) ("The denial of an evidentiary hearing on a sentencing guideline issue is reviewable only for 'abuse of discretion.'"); *United States v. Upshaw*, 918 F.2d 789, 791 (9th Cir.1990) ("An evidentiary hearing may be conducted by the district court in its discretion [at the time of sentencing], but such a hearing is not mandatory."), *cert. denied*, —— U.S. ——, 111 S.Ct. 1335, 113 L.Ed.2d 266 (1991). It is just as clear that, at a bare minimum, he who expects to receive a discretionary dispensation must first seek it. Thus, the failure to ask the district court to convene an evidentiary hearing ordinarily spells defeat for a contention that one should have been held. *See United States v. Wells Metal Finishing, Inc.*, 922 F.2d 54, 58–59 (1st Cir.1991); ("Due process does not entitle the defendant to an evidentiary hearing where the defendant has failed to request one."); *United States v. Rigby*, 896 F.2d 392, 395 (9th Cir.1990) (similar); *see generally Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1120 (1st Cir.1989) ("[W]e regularly turn a deaf ear to protests that an evidentiary hearing should have been convened but was not, where, as here, the protester did not seasonably request such a hearing in the lower court."). Tardiff's case is engulfed within this generality.

■ Tardiff's claim that the court should have continued the sentencing hearing to afford him more of an opportunity to rebut the prosecution's evidence is equally specious. In the first place, Tardiff asked for, and received, a continuance of over five weeks. He did not request a further continuance. In the second place, the evidence presented at the sentencing hearing came as no surprise: Tardiff and his counsel had reviewed it well in advance. There was enough time to prepare a rebuttal. Lastly, even if a defendant is faced at sentencing with information that he has not had a chance to rebut—a situation that does not exist in this case—we think it incumbent upon the defendant to ask for a continuance then and there. After all, district judges are not mind readers. When, as here, the defense is confronted with the government's proffer at a sentencing hearing and does not move for a continuance, a later claim of surprise will not be countenanced. *See, e.g., United States v. Diaz-Villafane*, 874 F.2d 43, 47 (1st Cir.), *cert. denied*, 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989).

To sum up, Tardiff waived the right to complain about the lack of either an evidentiary hearing or a continuance. At any rate, he had ample opportunity to rebut the evidence massed against him at sentencing. No more was legally required.[3] *See*

---

**3.** In a polemic that sheds far more heat than light, Tardiff's counsel attempts to convince us

U.S.S.G. § 6A1.3 (providing that, when a factor important to sentencing is in dispute, the parties "shall be given an adequate opportunity to present information to the court regarding that factor").

■ 2. *Right to Confrontation.* Next, Tardiff argues that the district court, which did not take testimony but based its assessment of the loss on the PSI Report, victim impact statements, and the like, violated the Confrontation Clause of the federal Constitution.[4] The short answer to this plea is that Tardiff, although citing the Confrontation Clause at the time of sentencing, never requested an evidentiary hearing, thereby waiving the point. The slightly longer—and more definitive—answer is that, in the usual case, a defendant's Sixth Amendment right to confront the witnesses against him does not attach during the sentencing phase. *See, e.g., United States v. Kikumura,* 918 F.2d 1084, 1102–03 & n. 19 (3d Cir.1990) (declining to apply Confrontation Clause to guideline sentencing); *United States v. Reid,* 911 F.2d 1456, 1464 (10th Cir.1990) (similar), *cert. denied,* — U.S. —, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991); *United States v. Marshall,* 910 F.2d 1241, 1244 (5th Cir.1990) (similar), *cert. denied,* — U.S. —, 111 S.Ct. 976, 112 L.Ed.2d 1061 (1991).[5] There is nothing about this case that warrants some special prophylaxis.

■ 3. *The Quality of the Proof.* In a sally that bears a family resemblance to his Confrontation Clause foray, Tardiff lambastes the quality of the evidence upon which the sentencing court based its evaluation of the loss. This offensive does not get him very far.

■ At sentencing, "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Under this generous formulation, the sentencing court has broad discretion to determine what data is, or is not, sufficiently dependable to be used in imposing sentence. *United States v. Figaro,* 935 F.2d 4, 8 (1st Cir.1991); *United States v. Iguaran–Palmar,* 926 F.2d 7, 10 (1st Cir.1991). The court may, of course, rely on hearsay evidence, even hearsay not previously tested in the crucible of cross-examination. *See United States v. Aymelek,* 926 F.2d 64, 68 (1st Cir.1991); *United States v. Zuleta–Alvarez,* 922 F.2d 33, 36–37 (1st Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2039, 114 L.Ed.2d 123 (1991).

In this instance, the district court, in calculating the amount of loss, relied principally on a series of victim impact statements. We have examined these statements. They are regular on their face. They are sworn to by the affected investors. They are the type and kind of evidence on which sentencing courts have commonly relied. *See, e.g., United States v. Bruckman,* 874 F.2d 57, 63 (1st Cir.1989) ("the sentencing judge may properly consider victim impact information concerning financial losses of victims, in the context of a mail fraud case"). Tardiff has produced no evidence suggesting that the affiants lacked personal knowledge of the matters

---

that the court below disregarded U.S.S.G. § 6A1.3(b) and Fed.R.Crim.P. 32(a)(1). We are unable to make head or tail of this argument. Tardiff had adequate notice of the government's position and the evidence on which it relied. He was afforded every reasonable chance to rebut that evidence. When the record was complete, the district court made explicit findings that resolved each and every disputed sentencing factor. At that point, Tardiff did not seek any further opportunity to respond. The court thereafter proceeded to impose sentence. As far as we can tell, the requirements of the law were scrupulously followed in the course of these proceedings.

**4.** The Confrontation Clause is embodied in the Sixth Amendment. It provides:

> In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him; ....

U.S. Const. amend. VI.

**5.** Although panels in two circuits have held to the contrary, both circuits are rethinking their position. *See United States v. Silverman,* 945 F.2d 1337, 1343–46 (6th Cir.1991), *vacated, reh'g en banc granted* (Dec. 4, 1991); *United States v. Wise,* 923 F.2d 86 (8th Cir.1991), *vacated, reh'g en banc granted* (Mar. 15, 1991).

contained in the statements. We conclude, therefore, that the victim impact statements comprised competent proof at sentencing and were properly treated by the court below as reliable.

■ 4. *The Persuasiveness of the Proof.* Tardiff's final complaint about the section 2F1.1(b)(1)(L) adjustment is that the evidence upon which the trial court relied was insufficiently persuasive to show that the amount of loss exceeded $800,000. Under the best of circumstances, a defendant who challenges such a finding has an uphill struggle. For one thing, he must carry the heavy burden of persuading the court of appeals that the lower court's conclusion is clearly erroneous. *See United States v. Pavao,* 948 F.2d 74, 77 (1st Cir.1991); *see also United States v. David,* 940 F.2d 722, 739 (1st Cir.1991) (holding that "the determination of factbound matters pertinent to sentencing ... can be set aside only for clear error"), *cert. denied,* — U.S. —, —, —, 112 S.Ct. 605, 908, 1298, 116 L.Ed.2d 628, 809, 117 L.Ed.2d 520 (1992). For another thing, he must carry the burden of satisfying us that the court's evaluation of the loss was not only inexact, but was outside the universe of acceptable computations. *See* U.S.S.G. § 2F1.1, comment. (n. 8) (the sentencing court "need only make a reasonable estimate of the range of loss, given the available information").

■ Here, Tardiff falls far short of the requisite showing. His argument that the lower court mistakenly focused on the gross loss of investors' funds, rather than the net loss, even if factually supportable, is legally erroneous. The guidelines make it clear that the gross amount of victims' funds lost by reason of a defendant's course of criminal conduct can be an appropriate measure of the amount of loss for sentencing purposes.[6] *See* U.S.S.G. § 2B1.1, comment. (n. 2) (the "'[l]oss' means the value of the property taken");

*see also United States v. Curran,* 967 F.2d 5, 6 (1st Cir.1992).

Once this argument is by the boards, Tardiff's position reduces to a claim that the sentencing court could have found the facts differently or interpreted them in a more sympathetic manner. That claim may be true—but it is beside the point. Given the facts of record here, the inferences reasonably extractable therefrom, and the deferential standard of review, there is simply no principled way in which we can disturb the district court's closely reasoned finding that the victims' aggregate losses were in excess of $800,000. *See United States v. Ruiz,* 905 F.2d 499, 508 (1st Cir.1990) ("where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous"); *United States v. Jimenez-Otero,* 898 F.2d 813, 814–15 (1st Cir. 1990) (same).

### B.

### *Upward Adjustment for Planning*

■ The trial judge boosted Tardiff's offense level under U.S.S.G. § 2F1.1(b)(2) (providing for a two-level increase if the scheme practiced by the defendant involves, *inter alia,* "more than minimal planning"). The defendant attempts to persuade us that this two-level increase was ill-conceived. We are utterly unconvinced.

The court below specifically remarked the "degree of sophistication" that characterized Tardiff's criminality. The characterization seems apt. This defendant did not act on the spur of the moment. Rather, he pieced together a carefully orchestrated series of mailings designed to create a false impression as to how the pooled investment fund was faring. Falsifying

---

**6.** To be sure, net loss may, at times, be a concinnous indicator of the amount of loss. *See generally Shattuck,* 961 F.2d at 1015–16 (noting that, in situations where a defendant has fraudulently obtained a bank loan while simultaneously posting collateral, some courts permit the value of the collateral to be deducted in computing the amount of loss; discussing a split in the circuits). We need not decide today whether the sentencing judge in the case at hand *could* have computed the relevant amount by taking a "net loss" approach. We decide only that he was not compelled to do so.

financial records on a monthly basis over a long period of time, and doing so with sufficient artistry that dozens of investors are lulled into a misplaced sense of security, requires forethought and cunning. To argue that such a rigmarole does not embody "more than minimal planning" represents perhaps the ultimate elevation of hope over reason. The district court did not err in fashioning the upward adjustment. *See, e.g., United States v. Gregorio,* 956 F.2d 341, 343 (1st Cir.1992) (defendant's "repeated preparation and submission of false statements" held to justify enhancement under § 2F1.1(b)(2)); *United States v. Fox,* 889 F.2d 357, 361 (1st Cir. 1989) ("We cannot conceive of how obtaining even one fraudulent loan would not require more than minimal planning."); *see also* U.S.S.G. § 1B1.1, comment. (n. 1(f)) (defining "minimal planning").

## C.

### Upward Adjustment for Position of Trust

■ The trial judge also boosted Tardiff's offense level under U.S.S.G. § 3B1.3 (authorizing a two-level increase in offense level "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense"). In reaching this conclusion, the judge found that Tardiff occupied a position of private trust vis-a-vis the investors because he "was a person intimately involved in their financial affairs upon whom they relied"; and that Tardiff's abuse of this position greatly assisted his commission of the offense. The defendant assigns error to this adjustment. We discern none.

■ The prosecution has the burden of proving by a fair preponderance of the evidence that section 3B1.3 applies in a given case. *See United States v. Connell,* 960 F.2d 191, 197 (1st Cir.1992); *see generally United States v. Sklar,* 920 F.2d 107, 112 (1st Cir.1990) ("the government must prove facts central to increasing a defendant's offense level by a preponderance of the evidence"). On review, however, a bifurcated standard applies to the district court's rulings under section 3B1.3. Initially, the court of appeals must determine for itself the legal meaning of terms such as "position of public or private trust." *See United States v. Hill,* 915 F.2d 502, 505 (9th Cir.1990); *see also Connell,* 960 F.2d at 197 (holding that the legal meaning of the term "special skill," as used in section 3B1.3, is subject to de novo review). Beyond that point, however, the follow-on questions are likely to be factbound—for example, whether the defendant actually used the position to facilitate or conceal the offense of conviction, and if so, whether the position contributed to that misconduct in a significant way—thus putting a premium on the sentencing court's firsthand knowledge of the total circumstances and its familiarity with the nuances of the case. Accordingly, we review the lower court's application of the guideline to a given set of facts only for clear error. *See Connell,* 960 F.2d at 198; *United States v. Rehal,* 940 F.2d 1, 5 (1st Cir.1991).

■ In this case, the threshold inquiry answers itself. We agree with the Ninth Circuit that "the primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *Hill,* 915 F.2d at 506. We add that the extent to which occupancy of the position assists the malefactor in covering up a wrong previously committed is equally a badge of a position of trust. In a capitalistic society, an individual is unlikely to grant control over his or her funds to people plucked at random from the madding crowd. Virtually by definition, a money manager or financial adviser who is entrusted with, and who proceeds fully to exercise, broad discretionary powers in respect to other peoples' money occupies a position of private trust. *See, e.g., United States v. Yount,* 960 F.2d 955, 956–57 (11th Cir.1992) (involving trust officer of bank); *United States v. Castagnet,* 936 F.2d 57, 61–62 (2d Cir.1991) (involving former airline agent who misused access codes to issue free tickets); *United States v. McMillen,* 917 F.2d 773, 775–76 (3d Cir. 1990) (involving branch manager of bank);

*United States v. Ehrlich,* 902 F.2d 327, 330–31 (5th Cir.1990) (involving loan clerk employed by bank), *cert. denied,* —— U.S. ——, 111 S.Ct. 788, 112 L.Ed.2d 851 (1991). So here.[7]

The remainder of our inquiry is no more taxing. After sending a blizzard of falsified statements, Tardiff had unusually free rein, by virtue of his position, to avoid detection by cooking the books: juggling funds, robbing Peter to pay Paul, and issuing further apocryphal statements confirmatory of, and building upon, the original falsehoods. In fine, the defendant misused his position not only to facilitate the commission of widespread mail fraud but also to hide the fact of his wrongdoing from his victims. Moreover, the position of private trust contributed in a substantial manner to these malefactions. As the court below found, U.S.S.G. § 3B1.3 applied foursquare to Tardiff.[8]

### D.

#### *Downward Departure*

Lastly, Tardiff faults the district court for not granting his request to forgo an incarcerative sentence, or in the alternative, to impose a sentence less than the minimum specified in the applicable GSR. The plaint is meritless.

 A district court's refusal to depart from a correctly calibrated sentencing range, regardless of the suggested direction, is simply not an appealable event. *See United States v. Hilton,* 946 F.2d 955, 957 (1st Cir.1991); *United States v. Romolo,* 937 F.2d 20, 22 (1st Cir.1991); *United States v. Harotunian,* 920 F.2d 1040, 1044 (1st Cir.1990); *Ruiz,* 905 F.2d at 508–09. There is nothing about Tardiff's case that exempts it from the sweep of this general rule. The colloquy at sentencing makes it pellucidly clear that the judge knew he possessed the legal authority to consider a downward departure, but that, applying ac-

cepted legal principles to the facts at hand, he did not believe that exceptional leniency was appropriate. When, as here, a judge declines to depart after he or she has made an application of settled law to idiosyncratic facts, the court of appeals lacks jurisdiction to second-guess the decision. *See Hilton,* 946 F.2d at 957; *Romolo,* 937 F.2d at 22.

### III.

#### *Conclusion*

We need go no further. After careful perscrutation of the record, we conclude that the defendant was appropriately sentenced within the parameters of the federal sentencing guidelines. The judgment below must, therefore, be

*Affirmed.*

---

**7.** Although we place no reliance on it for present purposes, we note that Tardiff also served as the tax-return preparer for many of the same people. He thus occupied dual positions of private trust in some instances.

**8.** We note that U.S.S.G. § 3B1.3 contains an exception for cases in which the position of trust can fairly be said, by virtue of the nature of the crime or the criminal, to be factored into the base offense level. Tardiff does not contend that this exception applies in his case.